IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| Edward Wayne Sullivan,         ) | |
| ) | Civil Action No. 8:04-651-GRA-BHH |
| Plaintiff,   ) | |
| ) | |
| vs.                            ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| The Cato Corporation,          ) | |
| ) | |
| Defendants.  ) | |
| ) | |

This matter is before the Court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiff claims that, in the termination of his employment, the defendant discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et. seq.*, retaliated against him for taking medical leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et. seq.*, denied him benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002, *et. seq.*, and breached an implied oral contract of employment. The plaintiff additionally seeks equitable relief pursuant to the common law doctrine of promissory estoppel.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The defendant, The Cato Corporation, is a retailer of women's apparel operating retail stores throughout the United States. Within Cato there are two separate lines of retail stores: Cato stores (hereinafter "Cato Division") and It's Fashion! stores (hereinafter "IF Division"). With respect to both the Cato Division and the IF Division, there is a Store

Operations Department. Within Store Operations, there are Regional Managers who oversee a large, multi-state region of stores. (Def.'s Ex. AA 12.) The regions are broken down into smaller districts, such that each Regional Manager supervises several District Managers. (*Id.*) The District Managers in turn supervise Store Managers at all stores within their respective districts. (*Id.*)

In addition, Cato had an entirely separate Loss Prevention Department which employs Regional Loss Prevention Managers (hereinafter "RLPM's"). (Def.'s Ex. A.) The RLPM's work with the employees of Store Operations to control "shrink," or loss of merchandise through theft or paperwork errors. (Def.'s Ex. CC at 41.) At the time of his termination, the plaintiff was in an RLPM position.

The plaintiff was hired by Cato in July, 1996. He was initially hired as a Loss Prevention Auditor, and was promoted to the position of Regional Loss Prevention Manager in May, 1997. (Def.'s Ex. EE at 21, 23.) At the time the plaintiff was hired, the Loss Prevention Department was divided between the Cato Division and the IF Division.

On the Cato Division side, the RLPM's were supervised by Vice President for Loss Prevention Max Arenas, who reported to Senior Vice President for Finance and Controller Robert Sandler. (Def.'s Ex. CC at 11.) On the IF Division side, the RLPM's were supervised by Assistant Vice President and Director of Loss Prevention Brent Saxon, who reported to President and General Manager of the IF Division David Birdwell. (Def.'s Ex. BB at 4-5.)

In the summer of 1996, Saxon approached John Cato, who was then the head of the IF Division, and requested authorization to hire a Loss Prevention Auditor. (Def.'s Ex BB at 16.) John Cato agreed to allow Saxon to select a Loss Prevention Auditor. (*Id.*) Saxon immediately contacted the plaintiff, a former co-worker. (Saxon Dep. 6.) After completing the interview process, the plaintiff was hired.

2

Less than a year after hiring the plaintiff, Saxon promoted him to an RLPM position. Shortly thereafter, Saxon left the company. (Def.'s Ex. EE at 26.) Saxon's position was eventually filled by Dan Sikorra.

During the time that the plaintiff worked under Sikorra, his evaluations were generally favorable. However, the plaintiff consistently suffered in certain performance areas. In Sikorra's evaluation of the plaintiff for the 1998 year, he rated the plaintiff "marginal" in the area of Planning/Organization, noting that "[h]e does lack time management and organizational skills, however, which has hindered his performance." (Def.'s Ex. I.) Sikorra further noted that the plaintiff "still needs to improve getting his paper work turned in on time, on a consistent basis" and "has at times been late in handing in paperwork . . ." (*Id.*) The plaintiff's evaluation for the 1999 year reflected a failure to meet audit requirements in the 1st, 2nd and 4th quarters as well as a need to improve his participation in weekly conference calls. (Def.'s Ex. J.) The plaintiff's evaluation for the 2000 year reflected a familiar concern in the area of Planning/Organization: "Ed did not utilize his goal sheets to maximize the best use of his time. . . (Various reports and special project deadlines were also late or missed.)" (Def.'s Ex. D.) Sikorra also noted the need for the plaintiff to build "stronger organizational skills . . ." (*Id.*)

Critically, in late summer 2002, the company chose to merge the Loss Prevention Department for the Cato Division and IF Division. The merger substantially changed the workload of the RLPM's who had previously been responsible exclusively for IF Division stores. Whereas several of the Cato Division RLPM's had been responsible for between 150 and 200 stores, none of the IF Division RLPM's, like the plaintiff, had more than 75 stores immediately prior to the merger. (Def.'s Ex. B.) The plaintiff's store count, which had been the lowest of any RLPM, more than doubled, although it remained below the store counts of most other RLPM's. (*Id.*)

3

While Sikorra continued as the plaintiff's direct supervisor after the merger, Max Arenas had responsibility for all of the RLPM's and supervised Sikorra. (Sikorra Dep. 20, 46.) Arenas was far more stringent about reporting, paperwork and organization than Sikorra. (Def.'s Ex. DD at 46, 50.)

In the months following the merger, the plaintiff had consistent problems with missed deadlines, inaccurate reporting, and submission of schedules that did not accurately reflect where his whereabouts. (Ex. 1 to Def.'s Ex. AA; Def.'s Ex. L.) In addition, Arenas received a number of complaints from Regional Managers and District Managers concerning the plaintiff's lack of communication. (*Id*.) Both Arenas and Sikorra made efforts to help the plaintiff improve his performance, including meeting personally with the plaintiff in the field to help him accomplish his goals. (Def.'s Ex. DD at 46-47, 58-59.)

On January 30, 2003, both Arenas and Sikorra met with the plaintiff in Columbia, South Carolina. (*Id*. at 58-59.) They spent two hours going over organizational and planning issues. (Def.'s Ex. L.)

On February 11, 2003, the plaintiff took a medical leave of absence. (Def.'s Ex. M.) The following day, he submitted the FMLA-required medical certification indicating that the purpose of the leave was for eye surgery the following week. (Def.'s Ex. N.) The defendant authorized the plaintiff's leave and permitted him to use sick time and vacation to cover it. (Def.'s Ex. M.) The plaintiff returned from leave on Monday, March 3, 2003. (Def.'s Ex. O.)

In early February, 2003, a number of departments within Cato had been asked to develop a plan for reducing costs. (Def.'s Ex. CC at 10.) Sandler and Arenas discussed the options for eliminating positions with the least possible impact on productivity. The positions that both Sandler and Arenas felt could best be absorbed by other staff were those of Sikorra and the plaintiff. (Def.'s Ex. AA at 5.) Sandler and Arenas concluded that the plaintiff's low performance and the feasibility of dividing up his territory strongly suggested that his position was the most expendable of the RLPM's. (Def.'s Ex. CC at 13-16; Def.'s

Ex. AA at 17-19.) Arenas met with the plaintiff on March 14, 2003, and informed him of the decision. (Pl. Dep. 42.) In all, the defendant terminated sixteen employees during the March 2003 reduction-in-force, reducing payroll in several departments. (Def.'s Ex. Q.)

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position

is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

### I.    ADEA CLAIM

In an age discrimination case, a plaintiff must prove that "but for" his employer's discriminatory intent, he would not have been fired or laid off. *See Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 238 (4th Cir.1982). A plaintiff can meet this burden either through direct or indirect proof, or by invoking the Title VII, *McDonnell Douglas* scheme of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Goldberg v. B. Green & Co.*, 836 F.2d 845 (4th Cir.1988).

The plaintiff, in this case, seeks to prove his ADEA claim through the three-step proof scheme established in *McDonnell Douglas*, as applied in *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 430 (4th Cir. 2000.) Under that scheme the plaintiff

must establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *See Stokes*, 206 F.3d at 429. Once he establishes a *prima facie* case, the burden shifts to the defendant to "rebut the presumption of discrimination" by producing evidence that the employment action in question was taken "for a legitimate, nondiscriminatory reason." *Id*. Finally, if the defendant meets its burden of production, the presumption raised by the *prima facie* case is rebutted and "drops from the case," and the plaintiff then bears the ultimate burden of proving that he has been the victim of intentional discrimination. *Id*.

### A.    *Prima Face* Case

To establish a *prima facie* case of age discrimination, in the context of a reduction in force where, as here, performance is identified as the reason for the termination decision, the plaintiff must demonstrate: (1) he was protected by the ADEA; (2) he was selected for discharge from a larger group of candidates; (3) he was performing at a level substantially equivalent to the lowest level of those of the group retained; and (4) the process of selection produced a residual work force including some persons in the group who were substantially younger than him and who were performing at a level lower than that at which he was performing.[1] *Id*. at 429-30. The parties do not dispute that the plaintiff has satisfied the first two elements.

The Court, however, agrees with the defendant that the plaintiff has failed to satisfy the third element of his *prima facie* case. The 2002 evaluations, which ranked the RLPM's overall performance on a scale from one to five with five representing optimal performance, reflected the following scores for each RLPM:

```
Berry                3.26
Brashers             3.66
Cole                 3.69
```

---

[1] In their briefs, both the plaintiff and the defendant have advanced an articulation of the *prima facie* case as employed by the Fourth Circuit in reduction-in-force ("RIF") cases. The plaintiff, however, appears to reject that he was actually terminated pursuant to a RIF. The Court will analyze his claim both as a RIF and an individual discharge case.

|                         |       |
|-------------------------|-------|
| Cox                     | 3.97  |
| Liner                   | 3.71  |
| Sullivan (the plaintiff)| **2.46** |
| Viands                  | 3.64  |

(Ex. R, S, T, U, V, W, X.)[2]

The plaintiff's evaluation sets forth numerous specific problems, including an unacceptable level of participation in conference calls and one on one training of District Managers, poor communication, missed deadlines, failing to turn in reports, and indifference to the requests of store management within his territory. (Ex. R.) Sandler and Arenas, the decisionmakers in this case, confirmed that the plaintiff's 2002 performance was markedly weaker than the performance of his peers. When Sandler was asked at deposition how the plaintiff's performance ranked against that of his peers, he replied "unsatisfactory." (Sandler Dep. 15.) He explained that he reached this conclusion based upon whether goals were attained, the content and timeliness of reports, feedback from various personnel within Store Operations, and compliance with guidelines. (*Id*.) Arenas also testified that the plaintiff's performance was the lowest of the group, summarizing his concerns as follows:

> Not completing reports in a timely manner, not getting reports in to me at all, not being where he was supposed to be. . . . Complaints from the field about having problems with Ed of not communicating, not following up, not covering when they had new target districts.

---

[2] The plaintiff has submitted the affidavit of Sikorra, which suggests that Arenas requested that he lower the plaintiff's 2002 evaluation from the good/fully competent range to the "marginal range." (Pl.'s Ex. A at 2.) Sikorra indicated in his affidavit that he believed the plaintiff's performance should have been rated in the good/competent range. *Id*. However, in his deposition, Sikorra admitted that the plaintiff's performance was "low" and that he had "been performing less than he was previously." (Def.'s Ex. DD at 57-58.) The Court, therefore, will disregard the affidavit, as to this point, which is inconsistent with his deposition testimony. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975-76 (4th Cir.1990) (disregarding witnesses's affidavit that contradicted his deposition testimony); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

(Def.'s Ex. AA at 18-19.) Even Sikorra, who had consistently given the plaintiff high evaluations in previous years, conceded that, after the merger, "there was significant decrease in performance" in the area of completing reports; that the plaintiff had problems with members of Store Operations; and that he "was not up to par" with respect to paperwork, participation in conference calls and "follow-up stuff." (Def.'s Ex. DD at 26, 35-36, 57-58.) Despite having given the plaintiff high evaluations in previous years, Sikorra admitted that the score on the plaintiff's 2002 evaluation was the result of "low" performance. (*Id*. at 57.)

The plaintiff himself conceded that his performance declined in the period after the merger. (Def.'s Ex. EE at 32.) He admitted that both Arenas and Sikorra specifically traveled to locations within the plaintiff's territory to provide training and counsel him on the performance problems. (*Id*. at 34-35.) He further testified that he was given several sessions of extra assistance on his laptop computer. (*Id*. at 33-34.)

The plaintiff contends that he universally received satisfactory evaluations prior to his 2002 evaluation. The plaintiff's performance prior to the merger in 2002, however, is immaterial. The undisputed evidence indicates that after the merger and under the supervision of Max Arenas, the plaintiff and the other RLPMs were held to greater accountability in various areas and given more responsibility, (Ex. B). Although Sikorra remained as the plaintiff's immediate supervisor after the merger, Max Arenas had responsibility for all of the RLPM's and supervised Sikorra. (Def.'s Ex. DD at 20, 46.) Arenas was far more stringent about reporting, paperwork and organization than Sikorra. (*Id*. at 46, 50.) In order to impress upon the RLPM's the importance of these requirements, Arenas published and explained his expectations for the newly consolidated Loss Prevention Department. (Def.'s Ex. EE, Ex. 4 to Pl.'s Dep.) In addition to setting forth in specific detail the various reporting and organizational requirements for the new Department, Arenas observed that "we need to have a set of standards and guidelines that

9

we all agree on and live up to . . . a pattern of missed deadlines or poor quality work is an indicator of poor discipline." (*Id.*)

As a result, whether or not the plaintiff's performance prior to the merger was satisfactory is irrelevant to the performance inquiry because, after the merger, certain expectations were heightened under Arenas and, therefore, the plaintiff's performance was more finely scrutinized in those areas. "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (finding no evidence of pretext based on differing treatment by different supervisors); *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir.1999) ("Even assuming that USBI did deviate from its policy, this deviation does not raise an inference of discrimination. Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").

Critically, it is was Arenas' prerogative to establish the standards by which the plaintiff would be judged. *See Beall v. Abbott Laboratories*, 130 F.3d 614, 619-20 (4th Cir. 1997). Although the plaintiff "has expressed disagreement with the company's characterization of his own performance, and has pointed to uniformly positive ratings given to him . . . [he] nevertheless has failed to demonstrate that he performed," after the merger, "at even the lowest level of those [individuals] retained or that any one of those retained were performing at a level below him." *Mitchell*, 12 F.3d at 1316.

The plaintiff further contends that other RLPMs whose employment was not terminated also suffered from similar performance deficiencies, in the areas of reporting and organization. The plaintiff goes to great length to compare the language in the various evaluations. Even conceding that other RLPMs suffered similar performance issues, it does not mean that they suffered those problems to the degree that the plaintiff did. In fact the

10

evaluation scores and the deposition testimony of Sikorra and Arenas indicate that they did not.

Even when he was supervised by Sikorra, the plaintiff twice was rated "marginal" in the category of "Planning/Organization," the only RLPM so ranked by Sikorra. (Pl.'s Exs. B1, B3.) In the relevant 2002 time period, the plaintiff was ranked as "Marginal" again, while no other RLPM was ranked so low. (Pl.'s Exs. B5, C5, D4, E5, F5, G5, H.)  As noted previously, both Arenas and Sikorra counseled the plaintiff about his problems with organization and made special arrangements to meet personally with the plaintiff in an effort to help him improve. Thus, while it is true that other RLPM's missed deadlines from time to time, the record reflects unambiguously that the plaintiff was the worst performer in this category.

The Court is unaware of any prohibition against a company making a comparative decision between the relative inadequacies in performance of its employees.  The fact that other RLPMs struggled with organization or timely reports, does not undermine the defendant's conclusion that the plaintiff struggled to an even greater extent.  The plaintiff has not produced evidence to the contrary.  "The decision to discharge [one employee] and retain [another] is the kind of business decision that we are reluctant to second-guess." *Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) (citing *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA.")).

Finally, the plaintiff proffers other  "explanations" for the level of his performance. For example, he complains that he was unable to timely submit expense reports because his odometer was broken.  The plaintiff's arguments, however, do not prove, even if believed, that he was performing at the lowest level of others retained, they are merely excuses for failed performance.  In the case of the odometer, the plaintiff has relied on an

11

excuse that was within his power to remediate in a variety of ways. All such attempts, therefore, are unavailing.[3]

For all these same reasons, the plaintiff cannot establish the fourth element of his prima facie case that the RLPMs retained were performing at a lower level than him.

The Court agrees that a genuine issue of fact exists as to whether or not the plaintiff was discharged purely as part of a reduction-in-force or because of a lack of individual performance combined with the opportunity for discharge presented by a reduction-in-force. *See, e.g., Mitchell*, 12 F.3d 1310 (4th Cir. 1993) (analyzing the plaintiff's claim both as a RIF and an individual discharge). The resolution of that issue, however, is not material. Even, if the plaintiff's claim for age discrimination is analyzed under the standards established in *Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 238 (4th Cir.1982), for an individual discharge, the plaintiff has failed to meet his burden.

The third element of *Lovelace* requires the plaintiff to demonstrate that at the time of discharge, he was performing his job at a level that met his employer's legitimate expectations. *Id*. at 239. As the Court has already observed, the plaintiff has been unable to show that the defendant's expectations of him were not legitimate or that he satisfied those expectations. *See Mitchell*, 12 F.3d at 1316.

The Court, therefore, finds that no genuine issue of fact remains as to whether the plaintiff was performing at a level substantially equivalent to the lowest level of those of the

---

[3] The plaintiff also expends a lot of energy defending his poor "shrink" statistics. Although the plaintiff's explanation is persuasive, the record does not suggest to the Court that the plaintiff's shrink numbers were a substantial consideration in his termination. Accordingly, the plaintiff could not meet his burden on the third or fourth elements, even if a trier of fact disregarded deficiencies in his shrink performance.

The plaintiff also complains that various health issues, which had their onset around the time of the merger, are in fact to blame for his performance issues. However, the plaintiff's evaluations indicate that the performance issues which predated the merger and the onset of his physical problems were of the same kind as those that existed after the merger. It just happens that Arenas apparently cared more about such matters than Sikorra.

group retained or that he was otherwise meeting his employer's legitimate expectations. As a result, the plaintiff cannot establish a *prima facie* case of discrimination.

Even assuming he could, the plaintiff's ADEA claim still fails for failure to produce evidence that suggests the defendant's legitimate reasons for his termination were pretext.

### B.     The Defendant's Legitimate Non-Discriminatory Reasons

The defendant has met its burden of production by identifying the following legitimate, non-discriminatory reasons for terminating the plaintiff's employment: (1) poor performance and (2) the geography of his territory. Unsatisfactory job performance and a failure to prepare proper documentation constitute legitimate and non-discriminatory reasons for termination of employment. *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998) ("Inova's termination of Karpel was based on her unsatisfactory job performance, including her tardiness and failure to complete her monthly summaries.") Moreover, a corporate reorganization for economic purposes is also a legitimate non-discriminatory reason. *See, e.g.*, *Peterson v. West*, 17 Fed. Appx. 199, 202 (4th Cir. 2001) ("Further, the reorganization leading to Peterson's modified position was a legitimate business decision which had been proposed and formally approved before Peterson's protected EEO activity.")

### C.     Pretext

Because the defendant has proffered legitimate, non-discriminatory reasons for termination, the plaintiff bears the burden of demonstrating that the real reason for discharge is an illegal one. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000). As is most common, the plaintiff attempts to satisfy this burden by suggesting that the defendants' proffered reasons are pretextual or false. *See id.* at 144. As discussed above, the plaintiff's attempts, in regards to the plaintiff's performance, are unpersuasive and do not create a genuine issue of fact for trial. The plaintiff's disagreement with the defendant's evaluation is irrelevant. *See Beall,* 130 F.3d 614, 620;

13

*Evans v. Technologies Applications and Serv. Co.,* 80 F.3d 954, 960-61 (4th Cir. 1996); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980) (explaining that in determining whether an employer's articulated reasons for dismissal are pretextual, the perceptions of the relevant decisionmaker are pertinent).

The plaintiff also rejects as pretextual, although summarily, the defendant's suggestion that the plaintiff was selected for termination in part because his region was more susceptible to division among the other RLPMs. In fact, he dismisses the issue as a "red herring." The plaintiff's conclusory rejection does not create any genuine issue of fact as to this issue. Arenas testified that the plaintiff's territory was one of the regions best suited for consolidation. (Def.'s Ex. B, Def.'s Ex. AA at18-19.) It is undisputed that the plaintiff's position was never filled and that his territory was absorbed primarily by Karen Liner and Jim Cox, with a handful of stores in southeastern Georgia being taken over by Andy Berry. Apparently, Liner also had experience with many of the South Carolina stores, as she had been responsible for them prior to the consolidation. (Ex. B.)

Accordingly, the plaintiff has failed to produce any evidence that the defendant's legitimate, non-discriminatory reasons were mere pretext.

**II.     FMLA CLAIM**

To establish a claim for retaliation under the FMLA, the plaintiff may rely on a modified version of the *McDonnell Douglas* proof mechanism. *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). A plaintiff may make out a *prima facie* case of retaliation by establishing that (1) the plaintiff engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. *Dodgens v. The Kent Mfg. Co.*, 955 F. Supp. 560, 566 (D.S.C. 1997). The latter of these elements may in some cases be demonstrated by the temporal proximity between the protected activity and the adverse action. *Yashenko v. Harrah's NC Casino Co.*, 352 F.Supp.2d 653, 661-62

(W.D.N.C. 2005); *Blankenship v. Buchanon Gen'l Hosp.*, 140 F.Supp.2d 668, 674 (W.D.Va. 2001).  The Court finds that the plaintiff has established a *prima facie* case.  As to the disputed element of causation, the plaintiff's employment was terminated on March 14, 2003, only 11 days after his return from FMLA leave, on March 3.

However, "[w]hile temporal proximity is sufficient to meet the low burden required to establish a *prima facie* case of retaliation in violation of the FMLA, it is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext." *Heady v. U.S. Enrichment Corp.*, 146 Fed. Appx. 766, 770 (6th Cir. 2005) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir.2001)).  Therefore, the plaintiff "must provide further evidence that creates a genuine issue of material fact regarding the truth of [the defendant's] proffered reasons for her discharge." *Heady*, 146 Fed. Appx. at 770.

The Court, however, has already found that the plaintiff has not produced evidence from which a jury could conclude that the defendant's legitimate, non-discriminatory reasons for termination were pretextual.  The plaintiff's continued argument to that end fails.

The plaintiff is, therefore, left to make his case for retaliation under the ordinary principles of proof, using direct or indirect evidence.[4]  *See Burns v. AAF-McQuay, Inc.*, 96

---

[4] Although the Court has not located a Fourth Circuit decision that expressly states that a plaintiff may rely on the ordinary principles of proof in an FMLA case, it is only a logical conclusion and one consistent with the court's treatment of retaliation cases under every other related statutory scheme.  *See, e.g.*, *Rhoads v. F.D.I.C.,* 257 F.3d 373 (4th Cir. 2001) (ADA); *Burns*, 96 F.3d 728 (ADEA); *Diamond v. Bea Maurer, Inc.*, 128 Fed. Appx. 968 (4th Cir. 2005) (Title VII).  Moreover, in this District, FMLA retaliation claims are analyzed in accordance with the principles used in Title VII retaliation claims.  *See Dodgens*, 955 F. Supp. at 566.

It should also be noted that in the wake of *Desert Palace, Inc. v. Costa*, 539 U.S. 90, (2003), other jurisdictions have permitted plaintiff's to use the mixed-motive framework to demonstrate that retaliation for taking FMLA leave was a "motivating factor" in the termination decision, even if their exist other legitimate, non-discriminatory reasons for termination, like performance*.  See Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).

Regardless of the articulation, in this case, the plaintiff is not bound to make his proof through the *McDonnell Douglas* scheme exclusively, nor is he required, necessarily, to prove that the nondiscriminatory reasons for his termination were pretext.  He may use

F.3d 728, 731 (4th Cir. 1996). While the court disagrees that the plaintiff has "direct evidence" of retaliatory motive,[5] it appears that the plaintiff has indirect evidence, "sufficiently probative of the issue" of retaliation, to create a genuine issue of fact to submit to the jury. *See id*. Although a close call, the Court finds that the following evidence, when viewed in a light most favorable to the plaintiff, is sufficient for the plaintiff's FMLA claim to survive.

First, Tom Cole, another RLPM alleges he had a conversation with Arenas while the plaintiff was on FMLA leave, wherein Arenas expressed frustration with the plaintiff's absence. According to Cole, "It was said that, It's not like I dislike Ed, its he can't get the job done, you know, he's not responding well, he's having medical issues. And I remember this conversation because it was right after Ed had gone out . . . he was out on F.M.L.A. …which really twisted Max [Arenas]." (Cole Dep at 26.) A reasonable jury might interpret this remark either as a condemnation of the plaintiff's performance or as frustration with his absence associated with FMLA leave.

Second, a reasonable juror might conclude that Arena's notes (or RLPM log) express dissatisfaction with the plaintiff's absence on FMLA leave. (Ex. 1 to Arenas Dep. at 2.)

---

ordinary principles of proof to demonstrate that his FMLA leave was a motivating factor in the decision to terminate his employment. *See id*.

[5] Direct evidence is "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Hill, 354 F.3d at 284-85; Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995) *abrogated in part by Desert Palace, 539 U.S. 90*. It is evidence that the employer "**announced, admitted, or otherwise unmistakably indicated** that [the forbidden consideration] was a determining factor . . ." *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir.1982) (emphasis added) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir.)). In other words, there has to be a nexus between the offensive remark and Plaintiff's eventual termination for that remark to comprise direct evidence of discriminatory discharge." *Eruanga v. Grafton School, Inc.*, 181 F. Supp. 2d 514, 521 (D. Md. 2002). The plaintiff must present, "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion." *Fuller*, 67 F.3d at 1142 (citations omitted). The plaintiff has no such evidence.

16

Finally and importantly, it is undisputed that the plaintiff claims that some time during his leave, Max Arenas called him at home, apparently angry over reports that the plaintiff had not turned in. According to Arenas, the reports at issue had been due in January and that the plaintiff had promised at their meeting in Columbia on January 30th that he would turn them in within a week. (Ex. L.) The plaintiff described the call and the subject thereof as follows:

> . . . Max called me one time, one particular time, which upset me greatly, when I was on FMLA, and he, to quote, "I don't understand what your problem is." And I was very upset by that.
> . . .
>
> Q. Well, what was he referring to?
> A. I assume getting reports in. I don't really know.
>
> Q. Do you know whether they were reports that were due before you went out?
>
> A. Oh, I'm sure there were some that were due before I went out and reports that hadn't got in. There's not a doubt in my mind about it that there were.
> . . .
>
> Q. So I assume, then, the reports that he was calling about didn't get done?
>
> A. I don't believe they were ever completed, no.

(Pl. Dep. 41-42.)

While calling an employee during an FMLA leave of absence is not *per se* evidence of retaliation or interference, *see Dodgens*, 955 F. Supp. at 564, calling can be probative of the issue when the plaintiff is asked to continue to do work-related matters while on leave. *See Arban v. West Pub. Corp.*, 345 F.3d 390 (6 th Cir. 2003). A jury might conclude that such a purpose was the intent of Arenas call.

17

This evidence in conjunction with the close proximity between his return from FMLA leave and his termination, when taken together and viewed making inferences in favor of the plaintiff, create a genuine issue of fact in regards to the plaintiff's FMLA claim.[6]

### III.     Breach of Employment Contract

Under South Carolina law, "termination of an at-will employee normally does not give rise to a cause of action for breach of contract." *Conner v. City of Forest Acres*, 560 S.E.2d 606, 610 (S.C. 2002); *Williams v. Riedman*, 529 S.E.2d 28, 32 (S.C. Ct. App. 2000). An at-will employment arrangement can be modified by an oral promise. *See Prescott v. Farmers Tel. Co-op., Inc.*, 516 S.E.2d 923, 926 (S.C. 1999). Notwithstanding, South Carolina courts are reluctant to transform vague assurances of job security into binding and contractual promises. To be binding, an oral offer must be definite in its terms. *See Prescott v. Farmers Tel. Co-op., Inc.*, 516 S.E.2d 923, 926-27 (S.C. 1999); *Davis v. Orangeburg-Calhoun Law Enforcement Comm'n*, 542 S.E.2d 755, 760 (S.C. Ct. App. 2001).

*Prescott* and *Davis* are dispositive of this case. In *Prescott*, an employee's supervisor allegedly told the employee "as long as you do your job, keep your nose clean, . . . you'd have a job [with the employer]." *Prescott*, 516 S.E.2d at 926. In *Davis*, the supervisor allegedly said to the employee that he would "only be terminated for cause." *Davis*, 542 S.E.2d at 760. In both cases, the court determined that these statements were not sufficiently definite to give rise to a contract of employment.[7]

---

[6] The plaintiff has taken FMLA leave in the past without incident. Although, this fact diminishes the likelihood that there is causal connection between his leave and the termination of his employment, *see Dodgens*, 955 F. Supp. at 566, the Court is not permitted to weigh this factor against the plaintiff's probative evidence. The plaintiff's reliance on *Proud v. Stone*, 845 F.2d 796 (4th Cir. 1991), however, is inapposite.

[7] The plaintiff rightly states that an oral promise of permanent employment is sufficient to alter the normal at-will status of an employment contract if supported by sufficient independent consideration apart from employment services rendered. *See Davenport v. Island Ford, Lincoln, Mercury, Inc.*, 465 S.E.2d 737, 739 (1995). The plaintiff, however, also concedes that leaving at-will employment is not sufficient "independent consideration." *See id.* Furthermore, the Court declines to accept the plaintiff's offer to conclude that leaving at-will employment, when the employee is at an "advanced age,"

In this case, Plaintiff relies exclusively on an alleged statement made by Brent Saxon at the time Saxon was recruiting him for a position at Cato. The plaintiff testified as follows:

> . . . I explained to Brent . . . that if I accepted a position with Cato Corporation, that I intended to retire from that position, and that I – that the only circumstances under which I would accept it was if I didn't have to go out looking for a job again.
>
> Q. What did Brent say in response to that?
>
> A. Brent assured me that Cato was a growing corporation, that they were constantly adding stores and that wouldn't be a problem.

(Pl. Dep. 18.) As a matter of law, Saxon's comments, even if true, are precisely the kind of vague statements that the South Carolina Supreme Court has rejected. "Vague assurances of job security, even if repeated, do not give rise to contractual rights." *Prescott*, 516 S.E.2d at 926 (citing numerous decisions from other jurisdictions).

## IV.    Promissory Estoppel Claim

The elements of a promissory estoppel claim in South Carolina are (1) a promise unambiguous in its terms; (2) reasonable reliance on the promise by the party to whom it was made; (3) the reliance is expected and forseeable by the party who made the promise; and (4) injury in reliance on the promise. *Powers Construction Co. v. Salem Carpets, Inc.*, 322 S.E.2d 30, 33 (S.C. App. 1984). The plaintiff has failed to produce evidence creating a genuine issue of fact as to, at least, elements one and four.

First, as stated, Saxon's promise was ambiguous, if a promise at all; the plaintiff, therefore, cannot establish the first element of his claim. Second, the plaintiff has not produced any evidence that he was injured due to his reliance on any alleged promise. At

---

constitutes sufficient consideration. Such a rule is not consistent with the South Carolina decisions. Moreover, the plaintiff's argument hinges on the difficulty of procuring new employment at an "advanced age." On the facts of this case, however, the plaintiff secured employment with the defendant and held it for 6 years. There is no assurance that he would ever have had his prior employment for as long. Regardless, the Court will not make a departure from the *Davenport* holding.

the time he accepted a position with the defendant, he was working for a temporary agency. (Def.'s Ex. EE at 15.) He was terminated by the defendant more than six years later. The plaintiff has not, and cannot, produce evidence that six years later he would have still been employed at his prior, temporary assignment—which, in fact, paid less than the his position with the defendant. To that end, the plaintiff would have to demonstrate that he actually would have been employed at his prior job long enough to make the same amount or more as he made working at a higher rate for the defendant in six-plus years. Any alleged "injury" would be rote speculation, inappropriate for the jury's consideration.

**V.     Additional Claims**

The plaintiff has made no showing or even a mention in regards to his ERISA or breach of the implied warranty of good faith and fair dealing claims. The Court, therefore, finds that the plaintiff has not met his burden in response to the defendant's evidence and argument and, otherwise, considers those claims abandoned.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the defendants' motion for summary judgment be GRANTED as to the plaintiff's ADEA, ERISA, Breach of Contract, Breach of Implied Warranty of Good Faith and Fair Dealing, and Promissory Estoppel Claims. The Court, however, recommends that the defendants' motion for summary judgment be DENIED as to the plaintiff's FMLA claim.

IT IS SO RECOMMENDED.

*Bruce H. Hendricks*
BRUCE H. HENDRICKS
UNITED STATES MAGISTRATE JUDGE

February 10, 2006
Greenville, South Carolina